IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 25 CR 693 |
| | ) | Judge April M. Perry |
| MICHAEL RABBITT, | ) | |
| KATHERINE MARIE ABUGHAZALEH, | ) | |
| ANDRE MARTIN, CATHERINE SHARP, | ) | |
| BRIAN STRAW, and JOSELYN WALSH | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MOTION FOR BILL OF PARTICULARS**

Defendants, by and through their respective counsel, respectfully move this Court, pursuant to Federal Rule of Criminal Procedure 7(f), and the Due Process and Double Jeopardy Clauses of the Fifth Amendment to the Constitution of the United States, for an order requiring the government to provide a bill of particulars furnishing the information requested below, so that Defendants are adequately apprised of the scope of the government's allegations, and, specifically to allow Defendants: (1) to prepare their defenses; (2) to avoid unfair and prejudicial surprise at trial; and, (3) to permit them to plead double jeopardy as a bar to further prosecution in the event future proceedings are brought against them. The motion is opposed. Specifically, Defendants request that the Court enter an order requiring the government to provide the following particulars:

- Identify all persons, both known and unknown, with whom Defendants allegedly conspired;
- Specify when the alleged conspiracy began;
- Specify when the alleged conspiracy ended;
- For each Defendant, identify which clause of §372 they conspired to violate;
- Identify all "threats" made as part of the alleged conspiracy;
- Identify the objects of the conspiracy; and
- Specify the acts undertaken in furtherance of the conspiracy.

1

This motion is compelled by the extraordinary nature of the broad and vague conspiracy charge that the government has brought against Defendants under 18 U.S.C. §372, a rarely invoked conspiracy statute that the current administration has used and threaten to use against others, ranging from protestors to sitting politicians, who have voiced disagreement with and expressed opposition to its policies, especially its aggressive immigration enforcement actions.[1]

I.      **Background**

In early September 2025, the U.S. Immigration and Customs Enforcement (ICE), supported by other law enforcement entities, unleashed an operation that it called "Operation Midway Blitz." This operation involved shocking displays of violence by federal law enforcement officers across Chicago and neighboring suburbs. It also involved the apprehensions of numerous individuals, often grabbed after being profiled because they spoke Spanish, looked Latino, or worked certain jobs, and were thus suspected of violating immigration laws. Once apprehended, these individuals were typically taken to a facility in Broadview, Illinois, that was used for immigration processing and detention, before being transported to other detention facilities, typically outside of Illinois.[2] The building located at 1930 Beach Street in Broadview will be described as the "Broadview Facility."

---

[1] *See* Camilo Montoya-Galvez, *DOJ investigating Gov. Tim Walz, Minneapolis Mayor Jacob Frey over alleged conspiracy to impede immigration agents*, CBS News, Jan. 17, 2026 (available at: https://tinyurl.com/29tj533s) (last visited Jan. 17, 2026) (noting the federal investigation focused on 18 U.S.C. §372; Ryan J. Reilly, *DOJ investigating Gov. Tim Walz and Mayor Jacob Frey, sources say*, NBC News, Jan. 16, 2026 (available at: https://tinyurl.com/ksz4j8sa) (last visited Jan. 17, 2026); WCCO Staff, *DOJ subpoenas Walz, Frey, Her and others in probe alleging immigration obstruction*, CBS News, Jan. 20, 2026 (available at: https://tinyurl.com/2cry2pw6) (last visited Jan. 21, 2026).

[2] This Broadview ICE facility was never intended to be a detention facility, but was used as such largely until class action litigation in *Gonzalez et al. v. Noem et al.* (N.D. Ill., Case No. 25 CV 13323). Judge Robert W. Gettleman granted a temporary restraining order regarding the "serious conditions" at this facility. *Id.* at Dkt. # 48 (Nov. 25, 2025, Order), at 1. Subsequently, ICE primarily uses this facility for processing. *See* Amy Qin & Sophie Sherry, *Broadview detainees during Operation Midway Blitz were self-deporting at alarming rates, analysis finds*, Dec. 29, 2025, WBEZ (available at: https://tinyurl.com/3zep4msu) (last visited Jan. 18, 2026) (providing overview of the facility's background and use).

While the Broadview Facility had been the site of protests, demonstrations, and religious gatherings for many years, Operation Midway Blitz resulted in a surge of immigration actions and indelible images of ICE and Custom and Border Patrol (CBP) officers violently interacting with citizens, and a corresponding increase in the number and size of protests and demonstrations at the facility. As the number of demonstrators increased at the Broadview Facility, so did the aggressiveness of ICE and CBP's response. As meticulously documented in the litigation captioned, *Chicago Headline Club, et al., v. Kristi Noem, et al.* (N.D. Ill., Case No. 25 C 12173) and specifically Judge Sara Ellis's comprehensive order dated November 20, 2025, granting plaintiffs' preliminary injunction following an extensive evidentiary hearing, *see id.*, Dkt. #281, ICE and CBP officers shot and targeted non-violent protestors, including clergymen, with munitions such as pepper balls and rubber bullets. In other documented instances, protestors were violently assaulted and even arrested based on narratives advanced by CBP and ICE officers that were later shown to be demonstrably false based on video evidence.[3]

On September 26, 2025, each of the Defendants along with numerous other individuals arrived outside the Broadview Facility to voice their dissent to "Operation Midway Blitz." Starting early in the morning, protestors engaged in what is called a "Jericho Walk," which involved walking back and forth across a marked, public crosswalk at the intersection of Harvard Street and 25th Avenue. This was done under the eye of the Broadview Police Department, which had multiple officers present at the intersection permitting the protestors to "Jericho Walk" for hours.

---

[3] In her preliminary injunction opinion and order, Judge Ellis repeatedly found defendants' evidence related to ICE and CBP officers' interactions with civilians and their justifications for the use of force to lack credibility. *See*, *e.g.*, *Headline Club*, Case No. 25 C 12173, Dkt. #281, p. 6 ("The Court next addresses the credibility of the parties' evidence and witnesses. After reviewing all the evidence submitted to the Court and listening to the testimony elicited at the preliminary injunction hearing, during depositions, and in other court proceedings, the Court finds Defendants' evidence simply not credible.").

Throughout the morning of September 26, 2025, Broadview Police officers helped control traffic, including by halting the "Jericho Walk" and parting the crowd of protestors when vehicles sought to pass through the crosswalk to either enter or leave the area. That was a regular occurrence throughout the morning as numerous vehicles passed through the crosswalk.

By 7:45 am, the crowd of protestors gathered at the intersection of Harvard Street and 25th Avenue had grown larger. At that approximate time, a large black SUV—a Ford Expedition—driven by an ICE agent and heading south on 25th Avenue, turned west (a right turn) directly into where the peaceful protestors were gathered at the intersection, many of whom were doing the "Jericho Walk." There is no indication from discovery tendered by the government that the ICE agent waited for the assistance of the Broadview Police, opting instead to drive directly into where the crowd was gathered.

Video recordings show a number of the Defendants near different areas of the SUV as it turned into the crowd of people. Recordings also show various Defendants promptly moving away from the SUV or being alongside the SUV as it continued to drive at a slow rate of speed toward the Broadview Facility. No recording provided by the government shows any Defendant causing any damage to the SUV, threatening the agent, or attempting to injure him. More relevant to the conspiracy charge, no discovery materials provided to date reflect or contain any evidence that any Defendant had any discussion with anyone at the scene about impairing, impeding, threatening, or injuring any ICE agent. Rather, when the SUV drove into where they were gathered and doing the "Jericho Walk," protestors and Defendants were chanting, holding signs, and expressing their opposition to the government's immigration policies, which is quintessential First Amendment conduct. Indeed, the conduct of the protesters and of these Defendants that has given rise to this misguided conspiracy charges is better seen as independent reactions unfolding in a totally

unplanned way while engaged in protected First Amendment activity—the opposite of any purported conspiracy.

## II.    The Indictment and Discovery to Date

On October 23, 2025, nearly a month after the SUV turned into the crowd of protestors and then continued to drive forward, an indictment was returned that charged all defendants with a conspiracy under 18 U.S.C. §372 and "impeding, intimidating, and interfering," the ICE agent under 18 U.S.C. §111(a)(1). Even though dozens of demonstrators participated in "Jericho Walk" when the SUV turned into them on Harvard Street, the six individuals chosen for the indictment all were publicly outspoken against what they descried as the administration's draconian, cruel, and unconstitutional immigration enforcement policies. This includes public statements and social media posts describing both experiencing and witnessing the violence and aggression of ICE and CBP. Most of these six individuals are also deeply involved in progressive politics. These commonalities are the only ties that bind them.

The §372 conspiracy count alleges that Defendants:

conspired with one another and others, known and unknown, to prevent by force, intimidation, and threat, Agent A, a United States law enforcement officer, from discharging the duties of his office, and to injure him in his person or property on account of his lawful discharge of the duties of his office, and while engaged in the lawful discharge thereof, and to injure his property so as to interrupt, hinder, and impede him in the discharge of his official duties.

(Dkt. #1, p. 3, ¶3). The indictment continues to allege that, as part of the conspiracy, Defendants and others:

banged aggressively on the Government Vehicle's side and back windows, hood, and other vehicle body parts; crowded together in the front and side of the Government Vehicle and pushed against the vehicle to hinder and impede its movement; scratched the body of the Government Vehicle, including etching a message into the body of the vehicle, specifically the word "PIG;" broke one of the Government Vehicle's side mirrors; and broke a rear windshield wiper off the Government Vehicle.

(Dkt. #1, pp. 3-4, ¶5). The indictment further alleges that it was part of the conspiracy to hinder and impede Agent A and the Government Vehicle by causing it to "drive at an extremely slow rate of speed" as it drove through the individuals. (Dkt. #1, p. 4, ¶6). As to each individual Defendant, the indictment alleges that they either put their body, hands, or body parts on parts of the Government Vehicle, thereby hindering and impeding Agent A as he drove into the crowd. (Dkt. #1, pp. 4-5, ¶¶7-12). The indictment does not allege that any of the Defendants caused any of the damage to the Government Vehicle described in the indictment or that any specific Defendant verbally threatened the agent.

Other than Mr. Martin, who is alleged to have "worked for or with" Ms. Abughazaleh, the indictment does not allege or describe any relationship between any of the Defendants beyond their presence outside the Broadview Facility on September 26, 2025. (Dkt. #1, pp. 1-2, ¶¶1(c)-(h)). Nor does the indictment include any details regarding the purported conspiracy amongst the Defendants, such as when it began, when it ended, how it formed, what planning was involved, or any other defining characteristics. Nor does the indictment allege that any of the Defendants knew that others would cause the alleged damage to the Government Vehicle.

In addition to the §372 conspiracy charge, each defendant is charged with a misdemeanor under 18 U.S.C. §111(a)(1). (Indictment, Dkt. #1, Counts Two-Seven). Each of these individual counts generally and opaquely alleges that the named defendant "forcibly impeded, intimidated, and interfered with an officer of the United States, namely, Agent A, while engaged in or on account of the performance of his official duties," in violation of 18 U.S.C. §§111(a)(1) and 2. Here too, none of these counts allege or describe any specific action by any Defendant.

To date, discovery produced by the government does not include any material that elucidates the contours of the charged conspiracy that is typically seen in conspiracy cases. There

are no communications between Defendants, no evidence of planning, and no advance discussion of actions amongst or involving any of the Defendants. Rather, Defendants were all present at the same protest.

Due to that missing information that is essential to defense and investigation of the charges, on December 3, 2025, counsel for Defendants made the following written request seeking information about the charged conspiracy:

<u>Documents/Information Relating to the Conspiracy Charge:</u>

16. Documents or information (in whatever form) pertaining to:

   a. Defendants' (or any individual Defendant's) membership in the charged conspiracy;

   b. Defendants' (or any individual Defendant's) communications with any other member(s) of the alleged conspiracy. This includes but is not limited to any communications that are part of the formation of the alleged conspiracy and/or communications related to any acts in furtherance of the alleged conspiracy;

   c. c. Any act(s) done in furtherance of the alleged conspiracy.

17. The identities of all alleged uncharged co-conspirators known to the Government.

In its written response dated December 18, 2025, the government wrote as follows:

Request No. 16: We refer you to the discovery produced and to be produced. The nature of this request resembles a civil discovery request; we are unaware of any criminal rule that requires us to create and produce in discovery a list of our evidence for each element of the offense. If you are aware of such an obligation, please let us know.

The government also declined to identify any uncharged individuals in response to Defendants' request for the identities of uncharged co-conspirators.[4] On January 21, 2026, counsel for Defendants emailed the government and sought the specific particulars requested in this Motion. The government responded that it would not provide the requested particulars for the reasons stated in its December 18, 2025, letter.

### III.    Legal Standard for Bill of Particulars

The Fifth Amendment to the Constitution provides, in relevant part, that "No person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." The indictment must be a "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). While plain and concise, an indictment must do more than merely parrot the language of the statute when doing so fails to provide defendants with adequate notice and the facts of the charged offense.

The Supreme Court emphasized the importance of providing necessary facts of the charged offense in *Russell v. United States*, 369 U.S. 749 (1962). In *Russell*, the Supreme Court reversed the convictions of defendants under 2 U.S.C. §192, which charged a misdemeanor when a witness appearing before a Congressional committee refuses to answer questions that are "pertinent to the question under inquiry." The indictments parroted the statute, but "failed to identify the subject under congressional subcommittee inquiry at the time the witness was interrogated." *Russell*, 369 U.S. at 752. The Supreme Court held that the indictments "must identify the subject which was under inquiry at the time of the defendant's alleged default or refusal to answer." *Id*. at 754.  In

---

[4] Additionally, prior to the December 3, 2025, letter written on behalf of all Defendants, counsel for Mr. Rabbitt sought similar details about the charged conspiracy from the government. In an email dated November 21, 2025, counsel for Mr. Rabbitt queried when the conspiracy was formed and who were its members. The government responded, in part, by writing that the answers could "be answered by the indictment and the discovery produced, including the videos which show the conduct, and by your own research on conspiracy law."

reaching that conclusion, the Supreme Court emphasized that it is "an elementary principle of criminal pleading, that where the definition of an offence, whether it be at common law or by statute, includes generic terms, it is not sufficient that the indictment shall charge the offence in the same generic terms as in the definition; but it must state the species,—it must descend to particulars." *Id.* at 765 (internal citation and quotation marks omitted). The words of the statute are only sufficient when they "fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished." *Id*. (internal citation and quotation marks omitted).

Rule 7(f) of the Federal Rules of Criminal Procedure enables the Court to order a bill of particulars when an indictment does not provide adequate notice of the facts of the offense. Accordingly, the bill serves to "inform the defendant of the charges, enable him to prepare a defense, and to minimize the danger of double jeopardy and unfair surprise at trial." *United States v. Caputo*, 288 F. Supp. 2d 923, 925 (N.D. Ill. 2003). *See also United States v. Vaughn*, 722 F.3d 918, 927 (7th Cir. 2013) (stating that a "bill-of-particulars analysis is similar to its constitutional sufficiency-of-the-indictment analysis; in both cases, the key question is whether the defendant was sufficiently apprised of the charges against him in order to enable adequate trial preparation.") (internal citations omitted); *United States v. Roman*, 728 F.2d 846 (7th Cir. 1987) ("[An indictment] must establish a record that shows when the defense of double jeopardy may be available to the defendant in the event future proceedings are brought against him[.]"); *United States v. Arberry*, Case No. 06 CR 278, 2007 WL 9706396 at \*1 (E.D. Wisc. Feb. 15, 2007) (Rule 7(f) of the Federal Rules of Criminal Procedure requires that the defendant be provided with "information about the details of the charge against him…if this is necessary to the preparation of the defense, and to avoid unfair surprise at trial.").

When a bill of particulars is necessary for these purposes, the court may order it even though it requires "the furnishing of information which in other circumstances would not be required because evidentiary in nature." *United States v. United States Gypsum Co.*, 37 F. Supp. 398, 403 (D.D.C. 1941). *See*, *e.g.*, *United States v. Barnes*, 158 F.3d 662, 665 (2d Cir. 1998) (if a bill of particulars is necessary to give the defendant adequate notice of the charges, "it will be required even if the effect is disclosure of evidence or of theories" (quotation omitted)).

Because bills of particulars serve critical functions, provisions authorizing courts to grant particulars should be "liberally interpreted." *United States v. O'Connor*, 237 F.2d 466, 476 (2d Cir. 1956). The 1966 amendment to Rule 7(f), eliminating the requirement that cause be shown before a bill of particulars is ordered, was "designed to encourage a more liberal attitude by the courts toward bills of particulars without taking away the discretion which courts must have in dealing with such motions in individual cases." Rule 7 Advisory Committee Notes, 39 F.R.D. 69, 170; *see United States v. Rosa*, 891 F.2d 1063, 1066 (3d Cir. 1989). The 1966 amendment had the effect of "increase[ing] the instances in which particulars are granted, thus contributing to the desirable decline in the 'sporting theory' of criminal justice." *United States v. Addonizio*, 451 F.2d 49, 64 (3d Cir. 1971) (footnote omitted). Thus, the defense should be "given the benefit of the doubt in gray areas." *United States v. Thevis*, 474 F. Supp. 117, 124 (N.D. Ga. 1979), *aff'd on other grounds* 665 F.2d 616 (5th Cir. 1982).

In evaluating a defendant's request for a bill of particulars, "the court may consider the complexity of the charges, the clarity of the indictment, and the degree of discovery available to the defense absent a bill." *United States v. Farley*, 1997 WL 695680 (N.D. Ill. 1997) (citing *United States v. Coffey*, 1993 WL 424239, at *10 (N.D. Ill. 1993) (citations omitted). As discussed in more detail below, while the government may contend that the charges relate to a narrow factual

event occurring within a short timeframe on September 26, 2025, by charging a conspiracy under

18 U.S.C. §372, the government has created both a factually complex and ambiguous case.

## IV. The Court Should Order the Requested Bill of Particulars

A bill of particulars providing information described below is needed because of how the

government has decided to charge the case under §372, the lack of pertinent discovery on the

contours of the conspiracy, the overarching First Amendment issues at stake, and the need for

Defendants to adequately defend themselves against the amorphous conspiracy charge and

safeguard against the risk of future jeopardy. An analysis of the elements of the §372 conspiracy

charge illustrates why that these particulars should be provided.

Through counsel's collective experience and research, 18 U.S.C. §372 is a rarely invoked

conspiracy statute, particularly in comparison to 18 U.S.C. §371, the more commonly used

conspiracy statute. Section 372 prohibits agreements to achieve certain ends enumerated in

separate clauses. More specifically, the statute provides in full as follows:

> If two or more persons in any State, Territory, Possession, or District conspire to
> prevent, by force, intimidation, or threat, any person from accepting or holding any
> office, trust, or place of confidence under the United States, or from discharging
> any duties thereof, or to induce by like means any officer of the United States to
> leave the place, where his duties as an officer are required to be performed, or to
> injure him in his person or property on account of his lawful discharge of the duties
> of his office, or while engaged in the lawful discharge thereof, or to injure his
> property so as to molest, interrupt, hinder, or impede him in the discharge of his
> official duties, each of such persons shall be fined under this title or imprisoned not
> more than six years, or both.

18 U.S.C. §372. Here, the government has charged the six Defendants with conspiring to violate

all three clauses of statute, namely: (1) to prevent by force, intimidation, and threat, Agent A, a

United States law enforcement officer, from discharging the duties of his office; (2) to injure him

in his person or property on account of his lawful discharge of the duties of his office, and while

11

engaged in the lawful discharge thereof; (3) and to injure his property so as to interrupt, hinder, and impede him in the discharge of his official duties.

Each clause in §372 "defines a discrete crime." *United States v. Gerhard*, 615 F.3d 7, 20 (1st Cir. 2010). Moreover, the terminology used in each clause is different. For example, in *Gerhard* the First Circuit addressing a double jeopardy argument where a defendant was convicted under 18 U.S.C. §372 based on the "prevent" clause, and also under 18 U.S.C. §371, for conspiring to violate 18 U.S.C. §111(a) by impeding an officer in the performance of his official duties. The First Circuit concluded that the term "prevent" from §372 is "future oriented, not present oriented" and thus distinct from "impeding" and "hindering." Using different terms showed that "Congress drew temporal distinctions between different opportunities to disrupt federal officers performing their duties, which again give 'prevent' a different meaning than to 'impede.'" *Gerhard*, 615 F.3d at 20. The first §372 clause also contains the word "threat," which has significant weight in First Amendment jurisprudence, requiring proof of "true threats." *See United States v. Payne*, No. 2:16-cr-00046-GMN-PAL, 2017 U.S. Dist. LEXIS 15651, at *21 (D. Nev. Jan. 3, 2017) (also noting that "a defendant may not be convicted of this offense simply because a federal officer subjectively felt threatened.").

Here, and especially if the government insists that it can charge in the conjunctive but prove in the disjunctive, the government may argue that some Defendants could agree to violate the first clause of §372, but other Defendants agreed to violate the third clause of §372. Such an approach could yield not one overarching conspiracy, but would force Defendants to defend against the potential of multiple conspiracies amongst subsets of Defendants whom the government may argue agreed to violate the statute in different ways through different clauses.

In other words, the government may argue that some Defendants agreed to "prevent by force, intimidation, and threat" Agent A from discharging his duties (clause one), while others agreed to "injure his property" to interrupt, hinder, and impede him (clause three). On the other hand, if it is the government's position that all the Defendants conspired to violate the statute through all three clauses, then the government should be held to that at trial. In other words, the government should not be permitted to argue the elements in the disjunctive and tell the jury it can convict any individual Defendant if it finds that there was an agreement to violate the statute through any one of the three means. These concerns are highlighted by the allegations in this case.

As noted above, *none* of the Defendants are individually alleged to have caused any damage or injury to the Government Vehicle. Rather, the indictment alleges, at most, that the individual Defendants took actions such as bracing their bodies against the vehicle, placing their hands or arms on the vehicle, or standing in the path of the vehicle. (Dkt. #1, pp. 4-5, ¶¶7-12). For one thing, those allegations did not "injure" the Government Vehicle, which is a necessary component of the second and third clauses of §372 (*i.e.,* "to *injure* him in his person or property on account of his lawful discharge…"; "to *injure* his property so as to interrupt, hinder, and impede…"). To the extent that the government will seek to impute the conduct of unknown others that it will argue damaged the vehicle (*e.g.*, the broken windshield wiper, broken mirror, or "PIG"), it is entirely unclear how Defendants could be held responsible for those independent acts by other actors, especially when the allegations of a conspiracy in the indictment are "so general that they do not advise the defendant[s] of the specific acts of which [they are] accused." *United States v. Williams*, 181 F. Supp. 2d 267, 294 (S.D.N.Y. 2001).

Further details on the scope of the conspiracy are especially needed particularly because one's mere presence and association alone is insufficient to establish membership in a conspiracy.

7th Cir. Jury Instr. 5.07; *United States v. Cochran*, 955 F.2d 1116, 1123 (7th Cir. 1992); *United States v. Barta*, 776 F.3d 931, 939 (7th Cir. 2015) (internal quotes omitted) ("A mere association with conspirators or knowledge of a conspiracy, even when combined with presence during conspiratorial discussions, is not sufficient to convict a man of conspiracy.").

Nor do the conspiracy allegations indicate when the conspiracy began and ended, which is an essential factor to know when defending any conspiracy charge. For instance, did the conspiracy begin whenever each Defendant arrived at the Broadview Facility on the morning of September 26, 2025? Did it begin the moment before the SUV turned onto Harvard Street from 25th Avenue into where the crowd was gathered and continued to drive forward? In order to assess available defenses, Defendants must know the duration and breadth of the purported conspiracy. If the conspiracy is to obstruct or impede the Government Vehicle, can one argue "withdrawal" if they step out of its way after it drives into the crowd?

The government's retort that Defendants should merely look at the discovery for answers falls flat. There has been nothing produced in discovery showing any connection between Defendants and any of those other individuals, beyond being engaged in First Amendment protest outside the Broadview Facility. This unique factual context heightens the need for the requested Bill of Particulars. The government's theory poses grave First Amendment risks by making individuals engaged in First Amendment activity responsible for the arguable criminal acts of others who were also present but were not known. Moreover, absent an agreement that is distinct from the protestors' intent to express their First Amendment rights, even collectively, the charge risks turning the exercise of a protected constitutional right into a criminal conspiracy, which simply cannot be. Put another way, Defendants are entitled to know the scope of the conspiracy that they are charged with, and which they must defend.

14

Additionally, by charging all three clauses of §372 *and* by charging each Defendant with a misdemeanor "impeding" charge under §111(a), the government has created a potential double jeopardy problem that necessitates a Bill of Particulars. In *Gerhard*, discussed above, the First Circuit declined to find a double jeopardy problem when the government proceeded *only* under the first §372 clause which uses the word "prevent" and also a §371 conspiracy to violate §111(a). Here, the government has also charged the third §372 clause which involves a conspiracy to injure property so as to interrupt, hinder, and impede. Thus, for the same reasons why there was not a double jeopardy problem in *Gerhard*, there could arguably be a double jeopardy problem here if a jury based its verdict on the third §372 clause and also convicted Defendants of misdemeanor assault under §111(a).

As such, Defendants requests that the government identify and describe following in a Bill of Particulars:

- Identify all persons, both known and unknown, with whom Defendants allegedly conspired;
- Specify when the alleged conspiracy began;
- Specify when the alleged conspiracy ended;
- For each Defendant, identify which clause of §372 they conspired to violate;
- Identify all "threats" made as part of the alleged conspiracy;
- Identify the objects of the conspiracy; and,
- Specify the acts undertaken in furtherance of the conspiracy.

## IV.    Conclusion

For the foregoing reasons, Defendants respectfully request that the Court grant this motion and order the government to provide the requested bill of particulars.

Respectfully submitted,

| | |
|---|---|
| **/s/ Nancy L. DePodesta** | **/s/ Joshua G. Herman** |
| **/s/ Carly Alana Chocron** | Law Office of Joshua G. Herman |
| Taft Stettinius & Hollister LLP | 53 W. Jackson, Blvd., Suite 404 |
| 111 E Wacker Dr, Suite 2900 | Chicago, IL 60604 |
| Chicago, IL 60601 | (312) 909-0434 |
| 312-836-5884 | jherman@joshhermanlaw.com |
| ndepodesta@taftlaw.com | *Attorney for Katherine Marie Abughazaleh* |
| cchocron@taftlaw.com | |
| *Attorneys for Michael Rabbitt* | |

| | |
|---|---|
| **/s/ Theodore Thomas Poulos** | **/s/ Molly Armour** |
| **/s/ Terence H. Campbell** | Law Office of Molly Armour |
| **/s/ Valerie Ann Davenport** | 53 W. Jackson Boulevard, Suite 1424 |
| Cotsirilos, Poulos & Campbell, Ltd. | Chicago, IL 60604 |
| 55 E. Monroe Street, Suite 3250 | 773-746-4849 |
| Chicago, IL 60603 | armourdefender@gmail.com |
| 312-263-0345 | *Attorney for Catherine Sharp* |
| tpoulos@cotsiriloslaw.com | |
| tcampbell@cotsiriloslaw.com | |
| vdavenport@cotsiriloslaw.com | |
| *Attorneys for Andre Martin* | |

| | |
|---|---|
| **/s/ Christopher Parente** | **/s/ Brad Thomson** |
| **/s/ Damon M Cheronis** | **/s/ Tayleece Paul** |
| Cheronis & Parente | People's Law Office |
| 140 S. Dearborn, Suite 404 | 1180 N. Milwaukee |
| Chicago, IL 60603 | Chicago, IL 60642 |
| 773-458-4899 | 773-235-0070 |
| cparente@cheronislaw.com | brad@peopleslawoffice.com |
| damon@cheronislaw.com | tayleece@peopleslawoffice.com |
| *Attorneys for Brian Straw* | *Attorneys for Joselyn Walsh* |

16