IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 25 CR 693 |
| | ) Judge April M. Perry |
| MICHAEL RABBITT, | ) |
| KATHERINE MARIE ABUGHAZALEH, | ) |
| ANDRE MARTIN, CATHERINE SHARP, | ) |
| BRIAN STRAW, and JOSELYN WALSH | ) |
| | ) |
| Defendants. | ) |

**DEFENDANTS' REPLY IN SUPPORT OF**
**MOTION FOR BILL OF PARTICULARS**

The government's Response to Defendants' Motion for a Bill of Particulars confirms, rather than dispels, the indictment's failure to provide adequate notice to Defendants about the conspiracy charge under 18 U.S.C. §372. To make matters worse, the government largely ignores the conspiracy law that it has charged Defendants with violating, which only exacerbates the lack of notice that compelled Defendants' motion.

The §372 conspiracy statute can be violated through three distinct types of agreements that require proof of, among other things, (1) an agreement to prevent by force, threat or intimidation an officer carrying out his duties; (2) an agreement to injure an officer in his person or property while carrying out his duties; or (3) an agreement to injure property to hinder, impede, or obstruct an officer discharging his duties. Instead of identifying which of those three distinct agreements it intends to prove, the government repeatedly describes the offense as "hindering and impeding" at least a dozen times in its brief. But Defendants cannot be convicted of violating the §372 simply by commission of actions that "hinder and impede." Without more, such actions plainly do not

1

constitute a violation of any variations of the statute, and such a theory would effectively eliminate the mental state requirement of §372 by allowing a conviction without an "agreement" and other necessary elements, and would create intolerable and far reaching First Amendment problems. Moreover, the government's focus on "hindering and impeding" injects further uncertainty because the terms "hinder" and "impede" only appear in the third clause of §372. Defendants could not be convicted under the first two clauses of §372 even if there was an agreement that resulted in "hindering and impeding."

Because §372 expressly provides for three separate agreements that can each independently violate the law through three distinct conspiracies, Defendants are entitled to know which agreement(s) the government intends to attempt to prove that they entered, as it is black letter law that the "gist of a conspiracy is an agreement among the conspirators to commit an offense" and the "scope of the agreement determines the scope of the conspiracy." *United States v. Bruun*, 809 F.2d 397, 405 (7th Cir. 1987). If the government is pursuing a "hindering and impeding" theory, as its Response suggests, then it should simply say so, and give due notice to Defendants that only the third clause of §372 is at issue.

Additional particulars are essential because Defendants were unequivocally engaged in protected First Amendment activity throughout the morning of September 26, 2025. They are entitled to know whether the government will attempt to use their constitutionally protected acts of dissent against the administration's immigration enforcement actions as criminal acts of conspiracy. Simply providing Defendants with notice of when the allegedly conspiracy began and when it ended would help minimize the mystery of the government's facially expansive conspiracy allegations. But the government refuses to share such basic and presumably readily identifiable information. Without such necessary details, the government's amorphous conspiracy charge puts

every single individual lawfully participating in a protest at risk for being held criminally liable for any act of another protestor.

Accordingly, and as specified in Defendants' Motion, Defendants respectfully request that the Court enter an order requiring the government to provide the following particulars:

- Identify all persons, both known and unknown, with whom Defendants allegedly conspired;
- Specify when the alleged conspiracy began;
- Specify when the alleged conspiracy ended;
- For each Defendant, identify which clause of §372 they conspired to violate;
- Identify all "threats" made as part of the alleged conspiracy;
- Identify the objects of the conspiracy; and
- Specify the acts undertaken in furtherance of the conspiracy.

I. **Argument**

A. **Defendants' Motion is Procedurally Proper**

The government's Response begins with a purely makeweight argument that Defendants' motion is untimely because it was not filed within 14 days after arraignment or at a later time if the Court permits, citing Federal Rule of Criminal Procedures 7(f). (Response, p. 3). If the government believes it necessary, and even though it would be inconsistent with undersigned counsels' collective practice in this District, counsel seek the Court's permission to file the Motion.

Counsel also presume that had they filed their Motion within 14 days after arraignment, the government would have likely retorted that Defendants' Motion was premature because they should first sift through the discovery before filing and should also confer with the government. That is why Defendants did exactly that—review discovery and engage in a meet-and-confer process, including through written discovery requests reflected in their Motion—so as to efficiently present only actually contested issues to this Court.

3

**B. Background Facts and Discovery Heighten the Need for a Bill of Particulars**

The government contends that a bill of particulars is not necessary because the answers Defendants seek are contained in the discovery.[1] To the contrary, the discovery, in tandem with the expansive conspiracy charge alleged in the Indictment, creates more ambiguity that compels Defendants to seek the particulars set forth above, specifically about the scope of the alleged conspiracy. The body worn camera (BWC) footage from Broadview police officers, which was very recently produced on February 12, 2026, only increases the lack-of-notice problems that Defendants outlined in their Motion. While the parties have respectively described the events of September 26, 2025, in their pleadings (*see* Motion, Dkt. #61, pp. 2-5; Response, Dkt. #81, p. 2), that BWC footage clearly illustrates Defendants' need for particulars regarding the conspiracy.

As Defendants described in their Motion, beginning in the early morning hours of September 26, 2025, numerous individuals, including some of the Defendants, walked back and forth at the intersection of Harvard Street and 25th Avenue in Broadview, Illinois, while engaged in what is known as a Jericho Walk. (Motion, Dkt. #61, pp. 3-4). Protestors carried signs, American flags, chanted slogans, sang historical protest songs, and engaged in other quintessential First Amendment activity as they traversed the intersection. As also previously noted in Defendants' Motion, they did so in the presence of Broadview police officers, as depicted in these images taken from the recently produced BWC and dash camera footage:

---

[1] The government also asserts that the fact that Defendants set a "relatively quick trial date" indicates that the indictment and discovery are sufficient and no additional particulars are needed. (Response, Dkt. #81, pp. 5-6). Not so. The fact that Defendants have sought a prompt trial date merely shows their determination to fight these misguided charges and remove the tremendous weight of being under federal indictment, a substantial burden that the government may not understand.

4





These images set the stage for what happened later that morning, including by showing how protestors gathered at the intersection and walked across the street under the watchful eye—and with the implied permission of—the Broadview police officers. Other BWC videos corroborate Defendants' assertion that these same officers would move to part the crowd when cars entered and exited Harvard Street from 25th Avenue. The newly produced discovery also supports Defendants' assertion that unlike those prior instances, with the incident in question Broadview police officers did not give clear instruction and physically move to part the crowd, and Agent A

did not wait for them either as he turned his three-ton SUV directly into that crowd, which had grown in size compared to the group seen in the photos from earlier in the morning shown above.

Contrary to the government's claim that none of the defendants "move[d] out of the way as the ICE supervisor's car crawled forward" (Dkt. # 67, p. 3), the newly produced BWC footage also shows that many of the defendants were seen some distance *behind* the SUV after it continued to drive West down Harvard Street toward the Broadview Facility. For instance, the BWC footage unequivocally shows that Defendant Kat Abughazaleh quickly went back toward the intersection, *i.e.*, *away* from the SUV, to get out of its way and to grab a megaphone.

With megaphone in hand, and acting contrary to the purported goals of the alleged conspiracy, Ms. Abughazaleh's first words toward the crowd were, "*that's private property back there, come back*[.]" Then, speaking directly to the Broadview police officer standing next to her, Ms. Abughazaleh exclaimed, "*you just let him run us over! …. He literally just ran over my foot!*" The image below captures these moments **in the immediate aftermath** of the SUV turning into the crowd, and also shows Agent A's SUV (within the red circle), some distance from the intersection where Ms. Abughazaleh had retreated, which is also where she and other protestors had been marching for hours that morning:



Similarly, additional video footage shows that, like Ms. Abughazaleh, Defendants Joselyn Walsh, Andre Martin, Michael Rabbitt, and Catherine Sharp all independently moved away from the SUV within seconds after they found themselves in its path. As shown below, Ms. Walsh (in the red circle) can be seen with her guitar under her right arm, standing next to a Broadview police officer while the SUV was already driving away from her toward the Broadview Facility:



The image below shows Mr. Martin (in the red circle and standing next to Ms. Abughazaleh with her back turned) back at the intersection and at a distance far behind the vehicle as it proceeded toward the facility:



The next image shows Mr. Rabbitt (in the red circle) turning away from the vehicle and crowd of protestors, while additional footage produced in discovery establishes that Mr. Rabbitt is no longer present as the vehicle proceeded toward the detention facility:



Finally, in the immediate aftermath of the vehicle turning into the crowd, Catherine Sharp (in the red circle) can be seen observing the vehicle with a phone in hand, as it moved towards the facility.[2]



---

[2] The first and second images are from the recently produced Broadview police BWC footage, while the third and fourth images are from a video that was previously produced in discovery and that was also linked-to in the DOJ's press release announcing the indictment. *See* https://tinyurl.com/yftt6nus (last visited Feb. 22, 2026). The fifth image is from a different video which was also previously produced.

Thus, rather than cure the substantial lack of notice created by the indictment and the nuanced §372 charge, the discovery only exacerbates that indelible problem.

To explain further, the indictment fails to specify when the alleged conspiracy began and when it ended and the government has refused to provide that information. The discovery, including the newly produced BWC footage, suggests the government may argue that the conspiracy began in the early morning when people began the Jericho Walk across Harvard Street to "hinder and impede" traffic, as the government repeats throughout its Response.

Yet, the government has also produced in discovery material related to earlier protests when some of the Defendants were present at the Broadview Facility. For instance, the government included videos of Ms. Abughazaleh being violently thrown to the ground by a DHS agent on September 19, 2025, one week before the charged incident.[3] Including that incident from a week prior in discovery suggests that the government may paint the conspiracy with a broader brush.

On the other hand, the government's Response cites cases involving "spontaneous" conspiracies. (Response, Dkt. #81, p. 8, citing *United States v. Scott*, 979 F.3d 986 (2d Cir. 2020) and *United States v. Barber*, 442 F.2d 517 (3d Cir. 1971)). While both cases are easily distinguishable,[4] for the purposes of Defendants' Motion seeking particulars as to the scope of the

---

[3] This incident, involving a DHS agent grabbing Ms. Abughazaleh by the chest and aggressively throwing her to the cement, was widely reported and was one of the many incidents that drew nationwide attention to the government's aggressive response to protestors at the Broadview Facility. *See* Cindy Hernandez, Chip Mitchell, *Congressional candidate thrown to the ground, protestors tear-gassed in clashes at Broadview ICE facility*, Chicago Sun Times, Sept. 19, 2025, available at: https://tinyurl.com/5t3n935s (last visited Feb. 20, 2026) (includes video and images of Ms. Abughazaleh being thrown to the ground); Erum Salam, *Congressional candidates are tear-gassed, thrown to the ground by ICE near Chicago*, MS Now, Sept. 19, 2025, available at: https://tinyurl.com/3ha34z82 (last visited Feb. 20, 2026).

[4] In *United States v. Scott*, 979 F.3d 986, 991 (2d Cir. 2020) correctional officers were convicted for depriving a prisoner of his civil rights in violation of 18 U.S.C. §241 for jointly beating the prisoner. The Ninth Circuit affirmed the convictions after detailing how each officer worked together to beat the prisoner, restrain him, and subsequently remove potential witnesses, which was sufficient to establish an agreement, even though the assault started spontaneously after a punch was thrown. *Id*. 990-91. In *United States v. Barber*, 442 F.2d 517, 520 (3d Cir. 1971), the Third Circuit rejected a sufficiency challenge brought by

conspiracy, the government's reliance on those "spontaneous" conspiracy cases only adds to the general state of confusion and lack of notice, even without considering how the Seventh Circuit has observed that a "spontaneous response to information furnished one is not action pursuant to an agreement" and thus not a conspiracy. *Tierney v. Vahle*, 304 F.3d 734, 742 (7th Cir. 2002).

Perhaps the government will argue that the conspiracy started on September 19, 2025, when Ms. Abughazaleh was thrown to the ground; or maybe the alleged conspiracy began when organizers called for a protest on September 26, 2025; or maybe the conspiracy began at the crack of dawn on September 26, 2025, when protestors arrived at the Broadview Facility to march at the intersection of Harvard Street and 25th Avenue; or perhaps the conspiracy formed "spontaneously" when Agent A drove his three-ton SUV into the protestors at the intersection where they had been walking for hours in full view of the Broadview police nearby. The discovery only furthers the need for notice on this essential point, contrary to the government's argument.

Knowing which of the prohibited agreements from §372 the Defendants purportedly entered, when that conspiracy started and when it began, and knowing the identities of known conspirators would clarify much of the uncertainty created by the indictment. Indeed, that information is essential to the defendants' ability to prepare a defense and avoid surprise at trial. These are not sacrosanct secrets that the government is entitled to keep to itself, as it would have the Court believe through its cited cases. Rather, courts have often ordered the government to

---

individuals convicted under §372 when they attacked FBI agents in order to free someone in custody after detailing what each individual Defendant did during the attack. Notably, in a companion case (*United States v. Barber (Appeal of Loper)*, 429 F.2d 1394, 1396 (3d Cir. 1970)), the evidence was insufficient to convict another person when it showed that he joined the group, but did not include "proof of threatening words or gestures, or a display of weapons, or other sinister action" on his part. Thus, both of the government's cases focus on sufficiency of the evidence in factual settings that are starkly distinct than those alleged in the indictment, as fleshed out by the discovery, where—as noted above—that Defendants were engaged in First Amendment activity and then acted independently after the SUV turned into the crowd, including by moving away from its path.

define the start and end dates for charged conspiracies. *See United States v. Yim*, No. CR11-131MJP, 2011 U.S. Dist. LEXIS 145218, at *3-4 (W.D. Wash. Dec. 16, 2011) (ordering government to produce "a bill of particulars specifying when the conspiracy began"); *United States v. Garibalde-Barron*, No. EP-12-CR-1406-KC, 2013 U.S. Dist. LEXIS 14892, at *13 (W.D. Tex. Feb. 4, 2013) (ordering government to provide bill of particulars specifying its "theory of the formation of the agreement to join the conspiracy. In doing so, the government will indicate when the agreement took place, with whom the agreement was made, and the nature of the agreement."); *United States v. Martinez*, No. CR 13-00794 WHA, 2014 U.S. Dist. LEXIS 33607, at *19 (N.D. Cal. Mar. 12, 2014) (ordering government to provide a bill of particulars specifying the "earliest date" when the defendants were members of charged RICO and VICAR conspiracies); *United States v. Handl*, No. CR 15-00126 WHA, 2015 U.S. Dist. LEXIS 112627, at *11-12 (N.D. Cal. Aug. 25, 2015) ("The government shall provide the defense with a bill of particulars stating the earliest known date at which each individual defendant charged in Count 132 was participating in the conspiracy"); *United States v. Urbina*, No. 06-CR-336, 2007 U.S. Dist. LEXIS 55589, at *7 (E.D. Wis. July 31, 2007) (ordering government to provide particulars "that discloses the date that each is alleged to have joined the conspiracy").

The discovery also highlights the need not only for notice of the statutory clause purportedly violated, the time-period covered, and the identities of the unindicted coconspirators, but also for the government to specify the acts alleged to have been undertaken by each Defendant in furtherance of the conspiracy. This information is critical for the Defendants to form their defense to the conspiracy charge. For example, as depicted in the image from a video produced by the government in discovery, it is clear Defendant Brian Straw (in the red circle) is being pushed by an unknown individual from his backside:

11



Mr. Straw needs to understand the government's alleged acts it claims he undertook as part of this conspiracy. Surely even the government would acknowledge that an individual cannot be literally pushed into joining a conspiracy.

The basic information of when the conspiracy began and the identity of known unindicted coconspirators is necessary and essential for Defendants to formulate their defenses and avoid the risk of double jeopardy given the potential for multiple alleged conspiracies based on the particular §372 charge. *See United States v. Dale*, No. 06-00074-01-CR-W-DW, 2007 U.S. Dist. LEXIS 116888, at *5 (W.D. Mo. Nov. 9, 2007) (emphasis in original) (granting bill of particulars requiring government to "clarify[ ] *when* each defendant is alleged to have first joined each conspiracy" because "without knowing when each member is alleged to have joined the conspiracy, defendants cannot know the universe of conduct against which they must prepare a defense."); *United States v. Anderson*, 31 F. Supp. 2d 933, 938 (D. Kan. 1998) (granting bill of particulars to disclose the "identity of any unindicted coconspirators" and reasoning that "leaving unnamed coconspirators undisclosed subjects the defendants to a risk of double jeopardy if the government one day sought to indict the defendants because of their alleged conspiracy with the unnamed coconspirators."); *United States v. Trie*, 21 F. Supp. 2d 7, 22 (D.D.C. 1998) (requiring government "to provide the

12

names of all alleged co-conspirators regardless of whether they will be called as witnesses at trial."); *United States v. Ramirez*, 54 F. Supp. 2d 25, 30 (D.D.C. 1999) (ordering government to provide particulars of alleged coconspirators and overt acts "so that each defendant may understand the government's view of his alleged role in the conspiracy"). Without these requested particulars, the indictment, on its face, renders virtually every protestor who came to the Broadview Facility on September 26, 2025, and—based on discovery provided by the government, perhaps even before—a potential coconspirator, especially given the government's overly broad theory that "hindering and impeding" alone is a basis for a conspiracy charge.

While Defendants assert that there was no conspiracy of any kind and at any time, they have a right to tailor specific defenses to the charge the government has brought against them. For instance, if the government believes the conspiracy lasted until Agent A was within the Broadview Facility, then Ms. Walsh is entitled to argue that her presence well behind the SUV carved her out of any conspiracy that is charged, while simultaneously arguing that no conspiracy existed. Likewise, Ms. Abughazaleh would be able to argue that moving back to the intersection's corner, telling others to come back, and complaining that the Broadview police officer let Agent A "run us over" removed her from any conspiracy that, in the government's view, could have been unfolding at that very moment, while also arguing that no conspiracy ever existed. Similarly, Mr. Rabbitt and Ms. Walsh are entitled to argue that his decision to walk away from the SUV and crowd of protestors removed him from any conspiracy that is charged, while simultaneously arguing that no conspiracy existed. Put another way, if the government is not ordered to define the conspiracy, including when it began and ended, then Defendants are subject to unfair surprise at trial because the government would have license to morph the scope and means of the conspiracy in reaction to Defendants' arguments, which turns due process on its head.

13

Finally, defining the scope of the conspiracy, including by providing its start and end, along with the identities of unindicted known conspirators, will also help provide notice of both potential evidence that the government may seek to use against Defendants at trial. For example, the scope of the conspiracy will determine what "co-conspirator" statements are fair game under Federal Rule of Evidence 801(d)(2)(E). Similarly, the government suggests that it may pursue a theory of *Pinkerton v. United States*, 328 U.S. 640 (1946), under which the scope and duration of the conspiracy will determine what acts the government can seek to attribute to Defendants. For it is only after joining a conspiracy that a defendant can be held "accountable for his confederates' foreseeable acts." *United States v. Conley*, 875 F.3d 391, 401 (7th Cir. 2017). The risk of this expanded liability is severe, particularly given that the government acknowledges *none* of the Defendants personally caused the damage to the SUV as alleged in the indictment.

### C. The Requested Particulars Are Needed to Cure the Notice Problems Created by §372, Which Criminalizes Distinct Agreements, not Merely "Hindering and Impeding"

The government's Response also creates more confusion and uncertainty about the scope of the charges when it repeatedly asserts that Defendants "hindered and impeded" Agent A, while ignoring Defendants' arguments concerning how §372 can be violated by three distinct types of agreements. The Response thus heightens the need for a bill of particulars.

To recap, and as noted above, 18 U.S.C. §372 requires proof of a specific (1) agreement to prevent by force, intimidation, or threat an officer from discharging the duties of his office; (2) agreement to injure him in his person or property on account of his lawful discharge of the duties of his office, and while engaged in the lawful discharge thereof; or, (3) agreement to injure his property so as to interrupt, hinder, and impede him in the discharge of his official duties. Each clause "defines a discrete crime." *United States v. Gerhard*, 615 F.3d 7, 20 (1st Cir. 2010).

The government can thus prove a violation of §372 through three separate agreements that can yield three distinct conspiracies. The standard of liability is therefore different from, for example, a narcotics conspiracy under 21 U.S.C. §846 that involves multiple types of drugs because an agreement to possess or distribute any type of drug is sufficient to prove the conspiracy. Under §372, one who agrees to prevent an officer by force, threats, or intimidation, does not inherently agree to injure an officer or his property in order to impede, and thus cannot be convicted on that latter clause without proof of a separate agreement. Instead of addressing these unique features of §372, the government relies on general propositions, taken largely from straightforward narcotics conspiracy cases that do not implicate any of the nuance presented in the allegations and §372, and thus add little to nothing to the analysis. (Response, Dkt. #81, p. 10).[5]

Importantly, not one of the three clauses can be satisfied merely by showing that an individual "hindered and impeded" a government official. As the face of the statute makes clear, §372 requires more—namely an agreement to prevent an officer through force, threats, or intimidation, or to injure the officer in their person or their property. But by arguing that hindering and impeding alone is enough, the government apparently misunderstands those statutory limitations. Section 372 specifically requires an agreement to "*injure*" an officer's property "so as to molest, interrupt, hinder, or impede him in the discharge of his official duties." 18 U.S.C. §372. In other words, "hindering and impeding" is not a stand-alone crime, but is the object of the

---

[5] The government almost entirely ignores the actual elements of §372 except through general citation. It only mentions the statute's first clause, which prohibits an agreement to prevent an officer by force, threats, and intimidation in passing when it cites *United States v. Payne*, Case No. 15CR46 (D. Nevada) (Response, Dkt. #81, pp. 11-12), an infamous case involving armed militia members standing off against Bureau of Land Management officials. And despite repeatedly using the "hinder and impede" language, the government never even mentions the second and third clauses of §372, which require an agreement to injure an officer or his property either on account of his discharge of his duties or while engaged in those duties, so as to molest, interrupt, hinder, or impede the officer.

agreement to "injure." Moreover, "hinder" and "impede" only appear in the third clause of statute, which means that if the government is proceeding under either of the first two clauses, a conviction could not stand based on a "hindering and impeding" theory. Thus, the government's apparent position that it can prove its case simply by showing that Defendants or others generally "hindered and impeded" is legally wrong and underscores the need for the requested particulars.

Importantly, this is not merely an argument about the sufficiency of the evidence, as the government suggests in its response. (Response, Dkt. #81, p. 11). Rather, it is an argument that seeks clarity and notice about which of the three types of agreements the six Defendants must each defend against, and thus seeks notice of the agreement, the "gist" of their alleged crime. *Bruun*, 809 F.2d at 405. Also, if it is in fact the government's theory that the Defendants engaged in "hindering and impeding" independent from a specific intent to injure property, then the Government may have failed to state an offense and making the indictment subject to dismissal. Given the government's refusal to provide that information, as it stands, the government's untethered conspiracy deprives Defendants of notice on the basic issue of which conspiracy they allegedly entered, much less the requisite details such as when that conspiracy began and ended.

### D. The Indictment and Discovery Do Nothing to Cure Defendants' Significant First Amendment Concerns

The government's Response to Defendants' First Amendment arguments also falls short as it ignores the import of §372, the indictment, and the discovery. First, the government tries to assure the Court that its application of §372 against Defendants does not extend to the "mere expression of political beliefs or presence at a protest." (Response, Dkt. #81, p. 12). But rather than tell us the small subset of expression and activity that the government deems to be "good" protest that it will not prosecute, it should instead recognize that the structure of §372 and its three restrictive clauses limit the government's ability to prosecute only agreements to prevent by force,

intimidation, or threats, or agreements to injure an officer or his property. By ignoring those limitations and asserting that "hindering and impeding" is sufficient, the government's application of §372 inherently reaches First Amendment activity—such as a sit-in, passive resistance, or slowly marching across an intersection, all of which can "hinder and impede" but none of which involves a criminal agreement to cause injury or to prevent by force, threats, or intimidation.

Second, the government claims that the indictment and discovery "undercut any claim that defendants were charged with a conspiracy under Section 372 merely for being present at the Broadview protest or for expressing political beliefs." (Response, Dkt. #81, p. 12). The indictment fails to provide any notice to Defendants of how they agreed to engage in a conspiracy to violate one or more of the clauses in §372. There are no allegations that any Defendant encouraged violence, made threats, or damaged the SUV. There are no allegations of any advance planning or coordination amongst Defendants to prevent, by force, threat, or intimidation, or to injure the officer or his SUV. Quite to the contrary, the indictment alleges that other people in the crowd caused the alleged damage to the SUV. Defendants are each alleged to have only placed their hands on the car or pushed against it. Perhaps this means that the government will argue a "spontaneous conspiracy" theory that sprang into existence when Defendants and unknown others telepathically communicated with each other as the SUV turned into them. Regardless, simply informing the Defendants precisely when the spontaneous action of the Defendants and any alleged unindicted co-conspirators rose to the level of a conspiracy and also when that purported conspiracy ended may provide the requisite notice on this fundamentally important issue.

Additionally, the discovery only heightens the need for a bill of particulars, especially in light of the First Amendment issues. As seen in the images taken from the Broadview police BWC, protestors, including some of the Defendants, began marching at the intersection at dawn on

17

September 26, 2025, and continued for hours in the presence of Broadview police officers. Defendants are entitled to know if the government will argue that their protesting at the intersection was part of the conspiratorial agreement to violate one or more clauses of §372, and to also identify which clause(s) is at issue. Indeed, given its repeated use of "hindered and impeded"—one object that appears in just one of the three potential conspiratorial agreements—the government may argue that marching at the intersection "hindered" the ingress and egress of traffic and was illegal, even if it did not involve an agreement to "injure" property or "prevent" by force, threats, or intimidation. Defendants are entitled to know if that is the government's theory, because if it is, the case must be dismissed because it completely ignores the requirement for an illegal "agreement" and criminalizes First Amendment protest simply because it was an inconvenience— which is very often the purpose of protest as history readily reveals.

      The discovery, namely the newly produced BWC footage from Broadview police officers, also shows that Defendants moved out of the way of the SUV and even retreated to the intersection as the SUV drove toward the Broadview facility. The video clearly shows Ms. Abughazaleh grabbing a megaphone and shouting to her supposed coconspirators to "come back" and complain to a police officer that he "just let [Agent A] run us over!" and that he "literally just ran over my foot!" Perhaps the government will argue at trial that these comments do not matter because Ms. Abughazaleh and others were still part of a "spontaneous conspiracy," even for a few seconds, and that is enough to make them responsible for the acts of every single person who was protesting that day. In any event, Defendants are all entitled to know how the government can still maintain that any conspiracy existed in light of this discovery, which shows who the real aggressor was that day.

## II. Conclusion

For the foregoing reasons as well as those set forth in Defendants' Motion, the Court should order the government to produce the requested particulars set forth above.

Respectfully submitted,

| | |
|---|---|
| **/s/ Nancy L. DePodesta** | **/s/ Joshua G. Herman** |
| **/s/ Carly Alana Chocron** | Law Office of Joshua G. Herman |
| Taft Stettinius & Hollister LLP | 53 W. Jackson, Blvd., Suite 404 |
| 111 E Wacker Dr, Suite 2900 | Chicago, IL 60604 |
| Chicago, IL 60601 | 312-909-0434 |
| 312-836-5884 | jherman@joshhermanlaw.com |
| ndepodesta@taftlaw.com | *Attorney for Katherine Marie Abughazaleh* |
| cchocron@taftlaw.com | |
| *Attorneys for Michael Rabbitt* | |
| | |
| **/s/ Theodore Thomas Poulos** | **/s/ Molly Armour** |
| **/s/ Terence H. Campbell** | Law Office of Molly Armour |
| **/s/ Valerie Ann Davenport** | 53 W. Jackson Boulevard, Suite 1424 |
| Cotsirilos, Poulos & Campbell, Ltd. | Chicago, IL 60604 |
| 55 E. Monroe Street, Suite 3250 | 773-746-4849 |
| Chicago, IL 60603 | armourdefender@gmail.com |
| 312-263-0345 | *Attorney for Catherine Sharp* |
| tpoulos@cotsiriloslaw.com | |
| tcampbell@cotsiriloslaw.com | |
| vdavenport@cotsiriloslaw.com | |
| *Attorneys for Andre Martin* | |
| | |
| **/s/ Christopher Parente** | **/s/ Brad Thomson** |
| **/s/ Damon M. Cheronis** | **/s/ Tayleece Paul** |
| Cheronis & Parente | People's Law Office |
| 140 S. Dearborn, Suite 404 | 1180 N. Milwaukee |
| Chicago, IL 60603 | Chicago, IL 60642 |
| 773-458-4899 | 773-235-0070 |
| cparente@cheronislaw.com | brad@peopleslawoffice.com |
| damon@cheronislaw.com | tayleece@peopleslawoffice.com |
| *Attorneys for Brian Straw* | *Attorneys for Joselyn Walsh* |