UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 25 CR 693 |
| v. | |
| MICHAEL RABBITT, et al. | Judge April M. Perry |

**GOVERNMENT'S RESPONSE TO DEFENDANTS'**
**MOTION TO COMPEL**

## I. Background

To be absolutely clear at the outset, defendants' Motion to Compel is premised solely on unsupported accusations that are not only reckless but completely false. Defendants directly claim that the indictment in this case is the product of external political influence and unconstitutional political charging considerations that have been "exerted upon the United States Attorney's Office for the Northern District of Illinois" (USAO) by unknown persons in the White House and/or the Department of Justice (DOJ) in Washington, D.C. (Main Justice).[1] The unavoidable conclusions to be drawn from these accusations is that the four line Assistant United States Attorneys (AUSAs) who have been assigned to this case and their supervisors who reviewed and approved the indictment, including the Front Office, have not only

---

[1] "Defendants request that the government produce discovery to support a motion to dismiss for vindictive or selective prosecution, particularly records and communications relating to related to (sic) any improper influence exerted upon the U.S. Attorney's Office in the Northern District of Illinois that . . . led to their selection of the four remaining defendants for federal prosecution because of their protest activities and/or their outspoken opposition to the Trump administration's immigration enforcement efforts." Motion at 1; *see also* Motion at 2, 3, 4, 5, 6, 7, 19, 21, 22, and 23 for similar unsupported allegations that the government prosecutors possess such "discovery" and demanding its production.

acted in bad faith but have committed prosecutorial misconduct. Indeed, defendants would necessarily have this Court—and the public—believe that these prosecutors purposefully and consciously engaged in a conspiracy to violate the defendants' constitutional rights by targeting them for selective and vindictive prosecution for exercising those rights.

Defendants pusillanimously assert that they "do not contend—nor are they required to show—that the line AUSAs in this case harbored animus toward the Defendants charged in the case" and they "do not need to show animus of the line AUSAs or to (sic) the U.S. Attorney here in Chicago" to prevail on their motion. *Id*. at 2; 23. But these efforts to soft-pedal their accusations are irreconcilable with the straightforward averments that they believe there is evidence that persons in the White House and/or Main Justice directed the prosecutors in the USAO to engage in an improper prosecution and that those prosecutors did so. The ***only*** logical conclusion to be drawn is that defendants believe that the USAO prosecutors and their supervisors not only followed such directives but did so willingly and have such evidence in their possession. If it were otherwise, there would be no so-called "evidence" for the defendants to argue is responsive to their motion.

Defendants' position is squarely based on their nonsensical hypothesis that officials in Washington had such an interest in local Illinois government—including routine Oak Park ordinance meetings, *see* Motion at 12—that they could pick these politically obscure figures out of a crowd of dozens of pushing and shoving protesters, somehow recognize them as "enemies" of the Administration, order their selective

2

and vindictive prosecution, and blithely expect career prosecutors in Chicago to violate multiple ethical and legal standards to go along with illegitimate orders while jeopardizing their professional reputations. Such assumptions are the product of fevered paranoia and delusional speculation, not to mention grossly disingenuous and thoroughly irresponsible.

In short, defendants are not entitled to any discovery because no evidence exists to support their fatuous allegations about selective and vindicative prosecution.

## II. Requests Regarding Vindictive and Selective Prosecution Claims

### A. Defendants' Political Views Played No Role In Their Indictment (Requests 1-7, 9-11).

The indictment in this case was proposed, reviewed, and approved exactly like the hundreds of others routinely brought by the USAO year-in and year-out—that is, without any influence or interference by *anyone* outside the USAO. The decisions about who and what to charge were made by the USAO prosecutors and their supervisors based solely on positive identifications of the defendants and evaluations of their individual criminal conduct. Considerations such as defendants' political affiliations, activities, views, or positions were not considered in any way as part of the investigation or charging decisions. Accordingly, there are **no** communications of any nature from, to, or with *anyone* outside the USAO (other than the local FBI investigators assigned to the case) regarding any investigatory or charging decisions.

To be crystal clear, this specifically includes anyone in the White House and all components and offices of Main Justice. [2]

### B. Defendants Were Charged Because They Were Clearly Identified Engaging in Criminal Conduct.

Even a cursory review of the discovery makes clear that the charges against the original six defendants in this case were not based on improper political motives by the government. The videos of the incident clearly show that most individuals who swarmed and impeded Agent A's vehicle could not be identified because they were wearing masks or other coverings that obscured their faces, making a positive identification nearly impossible, as exemplified below by screenshots of the crowd taken from those videos.



---

[2] The first time the USAO communicated with Main Justice about the identity of the defendants in this case only came ***after*** a draft indictment was approved internally and was for the limited purpose of complying with the letter and spirit of Justice Manual Section 9-85.500.





However, the government faced no comparable difficulty in identifying the original six defendants, each of whom was unmasked and several of whom made public statements proclaiming that they were at the Broadview facility during the incident.

For example, defendant Straw wore a jacket with his name and the title "Village Trustee" on it and a distinctive red hat during the incident, as shown below:



And at a press conference several days later, Straw personally announced to the world that he was present at Broadview at 7:45 a.m. on September 26, 2025, and (falsely) claimed as an excuse for his criminal conduct—which included throwing a drink at Agent A's windshield—that he was "pinned" between Agent A's SUV and the protestors behind him.

Similarly, defendant Abughazaleh posted about the incident on several social media platforms and included video clips that clearly depicted her and defendant Martin obstructing Agent A's vehicle, including the post below on X:



Likewise, video on social media showed defendant Rabbitt's face clearly as he obstructed the vehicle, as shown below.





And former defendant Sharp posted a video of the incident on Tik Tok, where she proclaimed that "I was at Broadview again yesterday morning":



Finally, a Facebook post identified former defendant Walsh by name and photo:



Thus, all six original defendants were clearly identified and identifiable, as opposed to others who participated with them in criminally obstructing Agent A's performance of his duties.

### C. Others Were Not Charged Because They Could Not Be Identified Or Because of Evidentiary Considerations That Had Nothing To Do With Politics (Requests 7-8).

Politics or the identities of the people who obstructed Agent A's vehicle had nothing to do with who was charged. Even when the FBI did positively identify other individuals, the USAO made the final call on who to charge based on the strength of the evidence, including an evaluation of the seriousness of each individual's criminal conduct. As is often the case, this resulted in decisions not to charge various people, such as: (a) a City of Chicago Alderman who has called for the abolition of ICE; (b) a quasi-public figure who is well known for protesting at the Broadview ICE facility; (c) an attorney who made national news in early 2025 and who has been vocal about her

political views; and (d) several other people who, based on their presence at and participation in the Broadview protest, presumably share defendants' anti-ICE political views.[3] That these individuals were not charged belies defendants' unfounded speculations regarding bad faith and unconstitutional motives by the prosecutors who reviewed and charged this case, and underscores that charging decisions were based on the evidence and law alone—not politics or other improper considerations.

Moreover, the vast majority of individuals who engaged in criminal obstruction similar to that of the defendants were masked and could not be identified even after concerted efforts by the government. In fact, after the original defendants were charged, the USAO sought the public's assistance in identifying others who swarmed Agent A's Vehicle and engaged in comparable misconduct. *See* Press Release, *Federal Grand Jury in Chicago Indicts Six Individuals on Charges of Impeding Federal Agent Engaged in Immigration Enforcement Operations* (Oct. 29, 2025) ("If you recognize other individuals in the video who may be impeding law enforcement, you are encouraged to contact the FBI Chicago Field Office by logging on to https://tips.fbi.gov/home.").[4] That too belies defendants' unfounded claims that the government only targeted Democrat public figures for improper political reasons.

---

[3] To safeguard these uncharged individuals' privacy interests, the government is not identifying them in this public filing but will, if directed, submit their names *in camera*.

[4] *See* https://www.justice.gov/usao-ndil/pr/federal-grand-jury-chicago-indicts-six-individuals-charges-impeding-federal-agent.

**D.    Defendants Are Not Entitled to Additional Discovery.**

Defendants have all the information (and then some) that they are legitimately entitled to regarding the process that led to the charges against them. Their efforts to obtain discovery beyond that already furnished should be denied not only because no such evidence exists but because they have not made the rigorous showing required to support their selective or vindicative prosecution claims.

**1.    There is no evidence of selective prosecution.**

The demanding standards to pursue a claim of selective prosecution are clear. A claim of selective prosecution is "an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution." *United States v. Armstrong*, 517 U.S. 456, 463 (1996). Such a claim is founded on principles of equal protection. *Id.* at 465. In particular, the decision to prosecute may not be "deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification, including the exercise of protected statutory and constitutional rights." *Wayte v. United States*, 470 U.S. 598, 608 (1985) (internal citations and quotations omitted). An improper basis for selective prosecution includes the exercise of First Amendment rights. *Id.* at 604 (denying selective prosecution claim alleged by "vocal" opponents of a registration program claiming to have been impermissibly targeted for prosecution "on the basis of their exercise of First Amendment rights"); *Frederick Douglass Foundation, Inc. v. District of Columbia*, 82 F.4th 1122, 1141 (D.C. Cir. 2023) (prosecutorial decisions "cannot turn on the exercise of free speech rights.")

To demonstrate selective prosecution, a defendant must show that the prosecution was "motivated by a discriminatory purpose" and had a "discriminatory effect." *Armstrong*, at 465. To satisfy the discriminatory effect element, the defendant bears the burden of showing that "persons similarly situated have not been prosecuted" for the same offense. *United States v. Schoolcraft*, 879 F.2d 64, 68 (3d Cir. 1989). To determine whether individuals are similarly situated, courts assess a variety of factors, including "the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan." *Wayte*, at 607. To satisfy the "discriminatory purpose" element, the defendant must also show that "the decision to prosecute was made on the basis of an unjustifiable standard, such as race, religion, or some other arbitrary factor, or that the prosecution was intended to prevent his exercise of a fundamental right." *Schoolcraft*, at 68. Each of these elements must be shown with "clear evidence sufficient to overcome the presumption of regularity that attaches to decisions to prosecute." *United States v. Taylor*, 686 F.3d 182, 197 (3d Cir. 2012) (cleaned up).

To overcome the "presumption" of regularity in charging decisions by the government a selective prosecution claim asks a court to infringe on the separation of powers by exercising judicial power over a "special province" of the Executive. *Armstrong*, at 464. This is so because decisions to initiate charges, or to dismiss charges once brought, "lie[ ] at the core of the Executive's duty to see to the faithful execution of the laws." *Community for Creative Non–Violence v. Pierce,* 786 F.2d

12

1199, 1201 (D.C. Cir. 1986). The Supreme Court has repeatedly emphasized that "[w]hether to prosecute and what charge to file or bring before a grand jury are decisions that generally rest in the prosecutor's discretion." *United States v. Batchelder,* 442 U.S. 114, 124 (1979); *Bordenkircher v. Hayes,* 434 U.S. 357, 364 (1978). "The presumption of regularity supports" the prosecutorial decisions of the Attorney General and the United States Attorneys and "in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *Armstrong*, at 464 (citation omitted). The exercise of such discretion is "particularly ill-suited to judicial review" given that it depends on a multitude of factors outside the purview of the judiciary. *Wayte*, at 607 ("Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake."); *see also United States v. Fokker Services B.V.,* 818 F.3d 733, 741 (D.C. Cir. 2016) ("Few subjects are less adapted to judicial review than the exercise by the Executive of his discretion in deciding when and whether to institute criminal proceedings, or what precise charge shall be made, or whether to dismiss a proceeding once brought.") (quotation marks omitted).

Because the standard for showing selective prosecution is a "rigorous" one, so is the standard for obtaining discovery in support of such a claim. *Armstrong*, at 468 ("The justifications for a rigorous standard for the elements of a selective prosecution claim thus require a correspondingly rigorous standard for discovery in

aid of such a claim."). And the Supreme Court has reiterated the significant burden facing a defendant, explaining that defendant must show "some evidence of both discriminatory effect and discriminatory intent" even to obtain discovery in support of a selective prosecution claim. *United States v. Bass*, 536 U.S. 862, 863 (2002).

Courts thus routinely deny requests for discovery on how prosecutorial discretion was exercised in a given case. *See, e.g.*, *United States v. Davis*, 793 F.3d 712, 720 (7th Cir. 2015) (*en banc*) ("to the extent that [defendants] want information about how the United States Attorney has exercised prosecutorial discretion, *Armstrong* is an insuperable obstacle (at least on this record)."); *United States v. Hayes*, 236 F.3d 891, 895-96 (7th Cir. 2001) (evidence of media statements and anecdotal statements did not meet the burden required to obtain discovery under *Armstrong*); *United States v. Conley*, 5 F.4th 781 (7th Cir. 2021) (applying *Armstrong* standards to preclude discovery on a selective prosecution claim); *United States v. Wilson*, 123 F.4th 1021 (9th Cir. 2024) (reversing a grant of discovery based on a claim that the defendants had been selectively prosecuted due to the perception that they held anti-government views); *United States v. Thorpe*, 471 F.3d 652 (6th Cir. 2006) (reversing district court order granting discovery on a selective prosecution claim even in the face of defendants' argument that they could not show discriminatory intent without discovery).

Tellingly, defendants do not even cite the *Armstrong* standard, let alone attempt to explain why or how they can satisfy its rigorous standards. Instead, they rely only on Federal Rule of Criminal Procedure 16 boilerplate despite *Armstrong's*

14

emphatic holding that the discovery they seek is not subject to disclosure under Rule 16. *Armstrong*, at 463 ("[w]e hold that Rule 16(a)(1)(C) authorizes defendants to examine Government documents material to the preparation of their defense against the Government's case in chief, but not to the preparation of selective-prosecution claims.").

In this case, defendants have presented ***no*** evidence that individuals similarly situated to them were treated differently or that there was any improper purpose in the decision to charge them for the simple reason that there is no such evidence. Their motion should be denied for that reason alone. *Bass*, at 864. It is not enough to show that other individuals who impeded and obstructed Agent A's car were not charged. *See United States v. Wilson*, 123 F.4th 1021, 1028–29 (9th Cir. 2024) ("To be similarly situated means more than merely committing the same crime in the same place."). As explained above, the vast majority of individuals who swarmed the car could not have been prosecuted because the government could not identify them. And the few individuals who were tentatively identified but not charged are not similarly situated from an evidentiary and proof perspective, as charging decisions were based on the inherently discretionary evaluation of the relative strength of the evidence by prosecutors whose job it is to make exactly those evaluations—for example, either because of doubts that identity could be proven beyond a reasonable doubt, or based on an evaluation of the severity of their conduct vis-à-vis others at the scene. Those are plainly and permissible standard charging considerations that the Office exercises every day and ones that the former Assistant U.S. Attorneys who are now

defending this case as defense attorneys presumably did as well when they were Assistants in the Office. *Wayte*, at 607; *see also United States v. Rundo*, 108 F.4th 792, 803–04 (9th Cir. 2024) (the "strength of the evidence, *i.e.*, how easily a prosecutor can prove that an individual committed a crime . . . is a permissible consideration in making prosecutorial selections"). And the proof is in the pudding—two of the original six defendants have been dismissed with prejudice on the government's motion after further evaluation and review of the evidence by the USAO line prosecutors and their supervisors.

Finally, to the extent that defendants seek discovery about charging decisions regarding other incidents at the Broadview facility (Request 9), the government is not aware of any comparable incident at the Broadview ICE facility where a law enforcement vehicle was swarmed, impeded, and damaged. Their request is simply irrelevant to this case.

### 2. There is no evidence of vindicative prosecution.

For similar reasons, defendants have not made the exacting showing necessary to obtain discovery in support of a vindicative prosecution claim. The starting point for this claim, too, is the presumption of regularity and good faith. *United States v. Jarrett*, 447 F.3d 520, 525 (7th Cir. 2006) (surveying case law and explaining that "a court must begin from a presumption that the government has properly exercised its constitutional responsibilities to enforce the nation's laws") (quotation marks omitted). That "presumption of regularity" can only be overcome by "clear evidence to the contrary," and the standard of proof "is a demanding one." *Id.* (quoting *Armstrong* at 463).

16

A claim of vindictive prosecution, therefore, is "extremely difficult to prove." *Id.* at 526. A defendant "must affirmatively show through objective evidence that the prosecutorial conduct at issue was motivated by some form of prosecutorial animus, such as a personal stake in the outcome of the case or an attempt to seek self-vindication." *Id.* "Vindictiveness can also be established by showing that a prosecution was pursued in retaliation for the exercise of a protected statutory or constitutional right." *United States v. Monsoor*, 77 F.3d 1031, 1034 (7th Cir. 1996). To establish an actual vindictive motive to prosecute, "the defendant must show that (1) the prosecutor harbored genuine animus toward the defendant, or was prevailed upon to bring the charges by another with animus such that the prosecutor could be considered a 'stalking horse,' and (2) the defendant would not have been prosecuted but for the animus." *United States v. Koh*, 199 F.3d 632, 640 (2d Cir. 1999).

Despite this clear governing standard, here, defendants maintain that to prevail on this aspect of their motion they "do not need to show animus of the line AUSAs or to (sic) the U.S. Attorney here in Chicago, nor are we alleging such." Motion at 23. This admission alone forecloses their requests for discovery given that the charging decisions in this case were solely made within the USAO. *See Monsoor*, at 1034-35 (denying request for discovery where defendant admitted "that the United States Attorney (nor) any of her assistants harbored animus against him or acted with vindictive motives in pursuing the prosecution," and where animus from other officials would not be imputed to the federal prosecutors). And to obtain discovery based on alleged animus outside the prosecution team, a defendant must show that

17

the "ill will, whoever its bearer, actually motivated his prosecution"—*i.e.*, that animus from others outside the USAO "in some way prevailed upon the prosecutor in making the decision to seek an indictment." *Id.* They cannot make that showing here because there were no such persons that affected the decision to seek an indictment.[5]

Nor have defendants explained why or how any putative external animus had any bearing on the charges in this case. Indeed, nearly all defendants' so-called evidence (with the exception of defendant Abughazaleh) concerns statements that are not particularized to any defendants or their policy positions. As such, their concerns do not justify selective prosecution discovery. *See, e.g., United States v. McIver,* 809 F.Supp.3d 221, 251 (D. New Jersey). And more generally, as explained above, the charging decisions by the USAO were based on the facts and the law alone.

Defendants cite *United States v. Cary*, No. 25 CR 251, Dkt. 22 (Jan. 20, D.D.C. 2026), where the district court permitted discovery in support of a vindicative prosecution claim in a flag-burning prosecution based on an Executive Order directing the prosecution of flag burning cases. *Id.* at 18. But that case is distinguishable in two keys respects. First, the officers expressly mentioned the

---

[5] In another patently ridiculous claim, defendants postulate that "the fact that this case was charged by an AUSA assigned to the public corruption section raises further concerns" because "somehow the investigation made its way to the desk of a federal prosecutor assigned to investigate public officials for government misconduct" and this—in their subjective view—"seems at odds with past practice of the Office." Motion at 20. However, given the volume of potential arrests generated by Operation Midway Blitz on a daily basis during September and October 2025, a rotating roster of AUSAs from every Section (save the Appeals Section) was established to review those encounters, as the USAO routinely does on all sorts of heavy volume matters that arise randomly, such as prisoner petitions for compassionate release and sentencing guideline reductions, to supervised release and probation violations, to potential firearms charges. And more generally, surely the defense team—with three former AUSAs among them—is aware that AUSAs are not assigned only to cases within any particular Section's area of focus.

Executive Order when arresting Carey and "surmised that prosecutors might base their charging decisions on the order." *Id.* Second, the flag burning Executive Order on its face expressly directed prosecutions for flag burning. *Id.* ("Once police had brought prosecutors the case, it is hard to believe that they would feel free to defy the President by declining to charge Carey."). Here, defendants can point to no directive that orders that individuals be charged based on their political views or other impermissible considerations—because, of course, there are none.

Finally, defendants' whingeing about National Security Presidential Memorandum-7, that "Much of NSPM-7 is squarely directed at speech and nonviolent action by organizations and individuals protected by the First Amendment" and that this prosecution is therefore somehow tainted, Motion at 19-20, reveals only that they did not bother to read the Memorandum. In fact, contrary to their assertions, NSPM-7 directly **protects** lawful political activity permitted by the First Amendment:

> Sec. 2. Investigating Domestic Terrorist Organizations.
>
> (a) The National Joint Terrorism Task Force and its local offices (collectively, "JTTFs") shall coordinate and supervise a comprehensive national strategy to investigate, prosecute, and disrupt *entities and individuals engaged in acts of political violence and intimidation designed to suppress lawful political activity or obstruct the rule of law.* This strategy shall include the investigatory and prosecutorial measures set forth in this section.
>
> (b) The JTTFs shall investigate potential Federal crimes relating to acts of recruiting or radicalizing persons for the purpose of:
>
> > (i) political violence, terrorism, or conspiracy against rights; or
> >
> > (ii) the violent deprivation of any citizen's rights.
>
> (c) The JTTFs shall also investigate:
>
> > (i) institutional and individual funders, and officers and employees of organizations, that are responsible for, sponsor, or otherwise aid and abet

19

the principal actors engaging in the criminal conduct described in subsections (a) and (b) of this section; and

(ii) non-governmental organizations and American citizens residing abroad or with close ties to foreign governments, agents, citizens, foundations, or influence networks engaged in violations of the Foreign Agents Registration Act (22 U.S.C. 611 *et seq.*) or money laundering by funding, creating, or supporting entities that engage in activities that engage in activities that support or encourage domestic terrorism.

https://www.whitehouse.gov/presidential-actions/2025/09/countering-domestic-terrorism-and-organized-political-violence/; emphasis added.

Defendants' caterwauling about vindictive prosecution is meritless.

### III.   Request for Internal Directives and Orders to Law Enforcement (Requests 12-13)

As to Requests 12 and 13, the government has furnished defendants with discovery that demonstrates that Agent A has no recollection of ever receiving any training regarding how to drive when encountering protesters blocking the street entrance to his work. And the government agrees to seek and produce any communications, orders, or directions that were communicated to Agent A about how to interact with demonstrators. To the extent that no such policies were in fact communicated to Agent A, such records (if they even exist) are not relevant to defendants' fabulist theory that Agent A was the "aggressor" in this incident. Motion at 24.

The government otherwise objects to the breadth of Requests 12 and 13, including on the basis that they seek records that are far beyond the possession of the prosecution team. *See* U.S. Dep't of Justice, U.S. Attorney's Manual 9–5.001(B)(2) (Oct. 1, 2006) ("Members of the prosecution team include federal, state, and local law

enforcement officers and other government officials participating in the investigation and prosecution of the criminal case against the defendant." (citing *Kyles v. Whitley,* 514 U.S. 419, 437 (1995)).

## IV.    Conclusion

For the foregoing reasons, defendants' motion to compel discovery should be denied.

Respectfully submitted,

ANDREW S. BOUTROS
United States Attorney

By:    /s/ *William R. Hogan, Jr.*
WILLIAM R. HOGAN, JR.
MATTHEW SKIBA
ANDRES Q. ALMENDAREZ
Assistants U.S. Attorneys
219 South Dearborn St., Rm. 500
Chicago, Illinois 60604
(312) 353-5300